## In re BALDWIN.

(*Circuit Court, D. California.* March 31, 1886.)

CONSTITUTIONAL LAW — PRIVILEGES AND IMMUNITIES OF CITIZENS OF STATE — CONSPIRACY TO DRIVE OUT CHINESE.

Rev. St. § 5519, so far as it embraces a conspiracy to deprive Chinese residents of a state of the privileges and immunities secured to them by existing treaties, is constitutional. Per SAWYER, C. J., SABIN, D. J., dissenting.

On *Habeas Corpus.*

*A. L. Hart,* for petitioner.

*Hall McAllister* and *J. W. Armstrong,* for respondent.

Before SAWYER and SABIN, JJ.

SAWYER, C. J. The petitioner is in the custody of the marshal of this district, under a warrant issued by a United States commissioner, upon a charge of conspiracy with a number of other persons named, to deprive certain Chinese residents of the town of Nicolaus, but not citizens of the United States, of their right to reside, and pursue their lawful vocations, in said town, and of actually depriving them of such right by forcibly expelling them from their homes, and from the town, in pursuance of said conspiracy; thereby depriving them of their rights and privileges under the laws, and of the equal protection of the laws, guarantied to them under our treaty with China. The charge is apparently founded upon section 5519 of the Revised Statutes of the United States, which, so far as applicable to this case, provides that "if two or more persons in any state or territory conspire * * * *for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws,* * * * each of such persons shall be punished by a fine of not less than five hundred dollars, or more than five thousand dollars, or by imprisonment, with or without hard labor, not less than six months, nor more than six years, or by both such fine and imprisonment."

It seems to me that there can be no doubt that the acts charged are within the provisions of this section, and if the provisions, so far as they embrace Chinese aliens,—subjects of the emperor of China, —are constitutional and valid, that they constitute a very grave offense against the United States. So far as the provisions relate to the territories over which the United States have exclusive legislative power, there can be little doubt that the act is valid. *National Bank* v. *Yankton,* 101 U. S. 129, 133. If invalid so far as the state is concerned, the provision as to the territories is easily severable, and it will be upheld so far to be valid. *Packet Co.* v. *Keokuk,* 95 U. S. 80, 89; *Presser* v. *Illinois,* 6 Sup. Ct. Rep. 583. But in *U. S.* v. *Harris,* 106 U. S. 629, S. C. 1 Sup. Ct. Rep. 601, this provision was held to be unconstitutional and void, so far as it applies to citizens

of the United States within a state. If that decision is applicable to the facts of this case, of course it is controlling, and the petitioner is unlawfully held, and must be discharged.

But the *Case of Harris* depended solely upon the fourteenth amendment, which was held to be aimed only at *state* action, and did not apply to unlawful combinations of individual citizens against other citizens, acting wholly without color of law or authority of the state. On that ground alone it was held to be unconstitutional; the provisions authorizing appropriate legislation to enforce the amendment extending no further than to protect the rights expressly provided for in the amendment. In this case, however, the Chinese aliens against whom the conspiracy is aimed do not rely upon the fourteenth amendment alone, or at all, except so far as the right to enjoy all the privileges and immunities of citizens, and the equal protection of the laws, is implied from its provisions recognizing the rights by protecting them from hostile state legislation, upon the principles adopted in *Ex parte Yarbrough*, 110 U. S. 652, 664, 665, S. C. 4 Sup. Ct. Rep. 152, and *U. S.* v. *Waddell*, 112 U. S. 76, 80, S. C. 5 Sup. Ct. Rep. 35. They rely mainly upon other express provisions of the constitution. Article 6 of the national constitution provides that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and all *treaties* made, or which shall be made, under the authority of the United States shall be the *supreme* law of the land, and the *judges in every state* shall be bound thereby, *anything in the constitution, or laws of any state, to the contrary notwithstanding;*" article 1, § 10, "that no state shall enter into any treaty, alliance, or confederation;" article 2, § 2, that the president "shall have power, by and with the advice and consent of the senate, to make treaties, provided two thirds of the senators present concur;" and the last clause of section 8, art. 1, that congress "shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, *and all other powers vested* by this constitution in the government of the United States, or in any *department* or *officer* thereof."

Thus, the states have surrendered the treaty-making power to the general government, and vested it exclusively in the president and senate; and when duly exercised by the president and senate the treaty resulting becomes the supreme law of the land, to which not only state laws, but state constitutions, are in express terms subordinated. As to what subjects are within the treaty-making power, see *Parrott's Case*, 6 Sawy. 368, 369, S. C. 1 Fed. Rep. 481, and the numerous cases there cited. It certainly, under the authorities there cited, embraces the entire subject-matter of our treaties with China. The rights, privileges, and immunities guarantied are within the treaty-making power to grant. They are created under, and are dependent upon, the constitution of the United States. And in *U. S.* v. *Reese* the supreme court holds that "rights and immunities *created*

*by,* or *dependent upon,* the constitution of the United States *can be protected by congress.* The form and manner of protection may be such as congress, in the legitimate exercise of legislative power, shall provide. This may be varied to meet the necessity of the particular right to be protected." 92 U. S. 217. And in *Yarbrough's Case* the supreme court says: "The power arises out of the circumstance that the function in which the party is engaged, or *the right which he is about to exercise, is dependent on the laws of the United States.* In both of these cases *it is the duty of the government to see that he may exercise this right freely, and to protect him from violence while so doing, or on account of so doing.*" 110 U. S. 658, and 112 U. S. 80; 4 Sup. Ct. Rep. 152, and 5 Sup. Ct. Rep. 35.

There is nothing in the suggestion of counsel that the Chinese, on this principle, are better off than citizens. It is presumed that the state will protect its own citizens, while long experience shows that it will not always protect foreigners against the prejudices and hatred of citizens. But whether the suggestion be true or not cannot affect the question; for the state has not, in this particular, surrendered the power of protecting its own citizens among themselves to the United States. It has, however, surrendered its power over the intercourse of its citizens with foreign nations to the national government. The relations between the United States and foreign governments are matters of international and not mere state concern. The power to make treaties, and to grant rights within the state to aliens under treaties, necessarily involves the power to protect those rights when granted, either against the acts of the states or the citizens of the several states. Without this power of protecting the rights granted to aliens by treaty against hostile local prejudices, the power to grant such rights would be utterly futile and nugatory. Every right must have its remedy, or it is practically no right. The power to grant, without the power to protect, would be but in name without the substance. It is necessary for the national government to be empowered to execute its own laws, and especially its treaty stipulations with other nations. Without this power it would be impossible to avoid giving good cause for wars. Hence the power to protect the rights granted under treaties, as correlative to the power to grant, was fully vested in congress by the constitution. If this puts the Chinaman, as is said, in a better position than the citizen, so be it. But the state has surrendered that power to the general government in the one case, while it has not done so in the other. It might as well be said that the alien Chinese, or other nationality, is better off than the citizen because the former can always sue a citizen in the national courts while the latter cannot. There can be no doubt that making the violation of any rights so secured by the constitution and treaties "made under the authority of the United States" by a combination of individuals a criminal offense against the nation, and punishable as such, as is provided by section 5519, is a proper mode of protection.

Such combinations to violate treaty rights are matters, not merely of state, but international, concern, and may well involve questions of peace and war. By article 5 of the treaty called the "Burlingame Treaty," "the United States and the emperor cordially recognize the *inherent* and *inalienable right* of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for the purposes of curiosity, of *trade* or *as permanent residents*." And article 6 further secures to Chinese residents "all privileges, immunities, and exemptions enjoyed by the citizens and subjects of the most favored nation." 16 St. 740. The amended treaty of 1880 adds the still more comprehensive word "*rights*" to the words "privileges, immunities, and exemptions," and expressly provides that "Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord." And article 3 of the latter is as follows:

"If Chinese laborers, or Chinese of any other class, now either *permanently* or *temporarily* residing in the territory of the United States, meet with ill treatment *at the hands of any other persons,* the government of the United States will exert all its power to devise measures for their protection, and to secure to them the same *rights,* privileges, immunities, and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty." 22 St. 827.

Our treaty with Great Britain, still in force, will disclose what some of the rights so secured to the Chinese by these treaties are. It provides that "the inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports, and rivers in the territories aforesaid [of the United States and Great Britain, in Europe] to which other foreigners are permitted to come, to enter into the same, and *to remain and reside in any parts of the said territories, respectively.*" Pub. Treaties, 293, 299, 312.

Thus, the United States government has, by these treaties, made in pursuance of the constitution and under the authority of the United States, imposed upon itself the express obligation "to exert all its power to devise means for their [Chinese residents] protection," and to secure them the "*rights,* privileges, immunities, and exemptions," to which they are entitled where such Chinese residents meet with ill treatment *at the hands of any other persons,*" as well as in consequence of unfriendly legislation by the states. This right is not limited to state action, as the fourteenth amendment was held to be limited; but it is expressly extended to individual acts. Among those rights is the right to select a place for *temporary or permanent residence,* and to reside and pursue their lawful vocations at the places so selected. As to what the privileges and immunities secured are, see *Parrott's Case,* 6 Sawy. 373, S. C. 1 Fed. Rep. 481, and cases cited, and *People* v. *Marx,* 99 N. Y. 386, S. C. 2 N. E. Rep. 29.

Proper means for protecting these rights certainly include the enacting of criminal laws for enforcing, protecting, and securing the rights guarantied by the treaties made in pursuance of the provisions of the constitution cited.

These Chinese residents of Nicolaus, therefore, had rights arising under, and dependent upon, the constitution of the United States, and the treaties made in pursuance thereof between the United States and the emperor of China, which were violated by the acts charged upon which the arrest was made; and rights which it was competent for congress to protect by legislation in a proper form, under the clause cited, which authorizes it "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers vested by this constitution in the government of the United States, or in any department thereof;" and it was its imperative duty to protect such rights. Thus, the case of the Chinese residents of Nicolaus is clearly distinguishable from that of United States citizens arising under the fourteenth amendment, considered in the case of *U. S.* v. *Harris, supra,* and rests upon other and further provisions of the national constitution. Had section 5519 been expressly limited in terms, without including any other parties to a conspiracy for depriving, directly or indirectly, *Chinese subjects* residing in the United States of the "equal protection of the laws," or of "equal privileges and immunities under the laws," guarantied to them by the treaties, there could scarcely be a doubt, I think, of its constitutionality and validity. If, therefore, it be void as to the Chinese subjects affected by the acts charged, as well as to similar acts perpetrated upon citizens of the United States, it is only so because congress has attempted to accomplish too much in the same section by the use of language too comprehensive, including persons to whom these powers did not extend, and by so doing has vitiated the whole. It is not because the language does not include them, or for want of constitutional power, but for want of proper form in the provision,—because it is too broad; simply because it has spread too large a net. But Chinese subjects residing in the United States, under the stipulations of our treaties with China, constitute a separate, distinct, independent class, with distinctly defined and easily recognized limits; and it is not readily perceived why the *class* may not be easily segregated, and the provisions of the statute held constitutional and valid, and be fully enforced as to that class, even though void as to other persons and classes, relying on other provisions of the constitution, easily recognized, and without difficulty segregated.

Why should not the principle adopted in *Packet Co.* v. *Keokuk,* 95 U. S. 80, affirmed in *Presser* v. *Illinois,* 6 Sup. Ct. Rep. 580, at the present term of the supreme court, apply? The Chinese residents, under the treaty, may be regarded as a subject-matter entirely distinct from citizens of the United States. The provisions of the section as to the states, and as to the territories, operate, cer-

tainly, upon distinct subjects-matter; and the act, I take it, could and would be held valid, under the authorities cited, as to the territories, even though void as to the states and their citizens. They are easily segregated; then why cannot the Chinese residents as one subject-matter be separated from citizens as another, upon similar principles? The language of the court in *U. S.* v. *Harris* on this point should, doubtless, be considered with reference to the special facts of the case then in judgment. But still, it must be confessed that it is very broad, and the rule laid down may be intended to cover any case that can be brought within the terms of the statute. If so, of course the ruling is authoritative and controlling in this court; but like congress, in the language of section 5519, may not the court also have, inadvertently, used language broader than the exigencies of the case before it required?

It is proper to observe that in the case of Reese there was a defect in the statute, and also in the indictment, in the omission of one constitutional element or ingredient necessary to constitute the offense. Under the fifteenth amendment, then in question, it was necessary that the discrimination should be "on account of race, color, or previous condition of servitude." *This essential element was omitted* in the act, and in the indictment, and the court could not perfect the statute or indictment by inserting it. It was with special reference to this omission that the court made the observations in respect to separating the constitutional from the unconstitutional part of a provision so manifestly indefinite, afterwards repeated in *U. S.* v. *Harris* with reference to the thirteenth amendment. To the provisions and facts then under discussion the observations seem to me to be more appropriate than to the sections of the statutes, constitutional provisions, and the facts, as now presented. It must be remembered that section 5519 has thus far only been considered by the supreme court with reference to the authority conferred upon congress by the thirteenth, fourteenth, and fifteenth amendments relating to specific subjects-matter. It has never yet been considered with reference to the powers conferred by the more general and comprehensive clauses cited in this opinion from the constitution as originally adopted. The difference between the cases is very obvious, and the result arising upon the different conditions may, and it seems to me should, be entirely different.

The only difficulty I have is in satisfactorily determining whether the rule indicated in *U. S.* v. *Harris* or that in *Packet Co.* v. *Keokuk, supra,* relating to the segregation of the constitutional from the unconstitutional parts of the section, should be applied to the facts disclosed in the petition, writ, and return in this case. I can perceive no practical difficulty in applying the rule adopted in the latter case. If there is none, it should be applied. The specific question is one of vast consequence to the entire Chinese population of the United States, and of the utmost importance to the peace and good order of

society throughout the entire Pacific coast. It is of international consequence, involving the honor and good faith of the United States, and, possibly, the question of peace or war. If this section of the statute is valid as to Chinese subjects residing in the United States, and embraces the acts set out in the petition and return, then the acts of all the public meetings throughout the land looking to, and providing for, depriving Chinese subjects of the rights, privileges, immunities, and exemptions secured to them by our treaties with China, by means popularly known as "boycotting," or any other coercive means, no matter in what form, or through what channels applied, are criminal, and all those participating in them must be subject to the very severe penalties denounced by the statute. I can perceive no way of escaping this conclusion. The depriving of persons of any of the rights protected, by any means, either "*directly or indirectly*," is prohibited. Where one has a lawful right to do any given thing, it would seem that no body of other persons can, properly or lawfully, combine or conspire together to use coercive means, in any form, to prevent him from doing that thing. The two rights are inconsistent, and cannot properly co-exist. It can make no difference, in principle, whether the coercion is applied by direct force, or by combined and concerted action, to prevent him from exercising his right, by depriving him of the means of procuring a livelihood, and thereby inducing starvation, or even less serious consequences.

If the statute in this particular is not valid, then there are no means now provided by congress of protecting Chinese subjects in the enjoyment of the rights secured to them by the treaties, through the criminal laws of the country, unless the acts are within the provisions of section 5508 or 5336, Rev. St.; and if there is no statute covering the case, then the government has not yet fulfilled its treaty obligations under article 3 of the treaty of 1880. I shall not stop to discuss section 5508, and only remark that section 5336 provides that "if two or more persons, in any state or territory, conspire to overthrow, put down, or destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof; *or by force to prevent, hinder, or delay the execution of any law of the United States;* or by force to seize, take, or possess any property of the United States, contrary to the authority thereof,—each of them shall be punished by a fine of not less than five hundred dollars, and not more than five thousand dollars, or by imprisonment, with or without hard labor, for a period of not less than six months, nor more than six years, or by both such fine and imprisonment."

A "treaty," says the constitution, is a part of "the supreme law of the land." It has been insisted that the acts set forth in the petition constitute a conspiracy by force to prevent, hinder, or delay the execution of the treaty stipulations, or obstruct their operation, which,

it is said, is equivalent to obstructing its execution, and therefore of obstructing the execution of a law of the United States." If this be so, then the acts charged constitute an offense against the United States under this section as well as under section 5519. I am officially informed that 13 persons have just been indicted under this section in one of the districts of this circuit. But it seems to me that the acts are not so manifestly within the provisions of this section and section 5508 as within section 5519.

The specific questions now presented are questions of too vast consequence to be finally determined by a subordinate court. The peace and good order of the Pacific coast, and the honor and good faith of the nation, are involved, and require that the question should be at once presented to and promptly decided by the supreme court of the United States. The supreme court, in U. S. v. Harris, supra, says: "Proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that congress will pass no act not within its constitutional powers. This presumption should prevail unless lack of constitutional authority to pass the act in question is clearly demonstrated." Page 635. If there be any doubt, then, as to the constitutional authority of congress to pass section 5519, in its present comprehensive form, so far as it embraces the specific facts disclosed in this case, which have not yet been considered by the supreme court, or as to the applicability of the observations of the supreme court, in relation to separating the constitutional from the unconstitutional parts of the act, to the specific facts now presented,—the only point upon which I entertain any doubt,—the doubt should be resolved, especially in this court, in favor of the validity of the statute in this particular, and the question be referred at once to the supreme court to be authoritatively determined.

As there is doubt in my mind upon the point suggested, under the authorities as they now stand, I shall, for the present, and for the purposes of this case, rule against the petitioner, remand him to the custody of the marshal, and dismiss the writ. I do not desire, however, to be considered as finally determining the question in such sense that it will not be open for reconsideration, should the question be again presented in other cases before an authoritative decision can be had in the supreme court.

My associate, though with doubt and hesitation, dissents from the rulings made, and a certificate of opposition of opinion will be made if either party desires it, and a writ of error to the supreme court allowed. In view of the circumstances, and of the doubts entertained, should a writ of error be taken the prisoner will be allowed to go at large on his own recognizance until the decision on appeal; and in case the writ is pressed to an early hearing, it is suggested that the government do not prosecute other similar cases arising under the

Revised Statutes, especially such as have already arisen, until an authoritative decision can be had.

Let the writ be dismissed, and the prisoner remanded to the custody of the marshal.